# IN THE UNITED STATES COURT OF APPEALS
# FOR THE FIFTH CIRCUIT

ROBERT L. APTER, MEDICAL DOCTOR, FACEP; MARY TALLEY
BOWDEN, MEDICAL DOCTOR; PAUL E. MARIK, MBBCH, M.MED, FCCM,
FCCP,

Plaintiffs-Appellants,

v.

DEPARTMENT OF HEALTH & HUMAN SERVICES; XAVIER BECERRA, IN
HIS OFFICIAL CAPACITY AS SECRETARY OF HEALTH AND HUMAN
SERVICES; FOOD & DRUG ADMINISTRATION; ROBERT M. CALIFF, IN
HIS OFFICIAL CAPACITY AS COMMISSIONER OF FOOD AND DRUGS,

Defendants-Appellees.

On Appeal from the United States District Court
for the Southern District of Texas

## BRIEF FOR APPELLEES

*Of Counsel:*

SAMUEL R. BAGENSTOS
  *General Counsel*
  *U.S. Department of Health and Human Services*

MARK RAZA
  *Deputy General Counsel*
  *U.S. Department of Health and Human Services*
  *Chief Counsel*
  *Food and Drug Administration*

WENDY S. VICENTE
  *Deputy Chief Counsel, Litigation*
  *Food and Drug Administration*

LEAH A. EDELMAN
  *Associate Chief Counsel*
  *Food and Drug Administration*

BRIAN M. BOYNTON
  *Principal Deputy Assistant Attorney
  General*

ALAMDAR S. HAMDANI
  *United States Attorney*

DANIEL TENNY
ASHLEY C. HONOLD
  *Attorneys, Appellate Staff*
  *Civil Division, Room 7261*
  *U.S. Department of Justice*
  *950 Pennsylvania Avenue NW*
  *Washington, DC 20530*
  *(202) 353-9018*

## CERTIFICATE OF INTERESTED PERSONS

A certificate of interested persons is not required, as defendants-appellees are all governmental parties.  5th Cir. R. 28.2.1

## STATEMENT REGARDING ORAL ARGUMENT

The government does not believe oral argument is necessary but stands ready

to present oral argument if the Court would find argument helpful.

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES .................................................................................iv

INTRODUCTION ........................................................................................1

STATEMENT OF JURISDICTION ...............................................................2

STATEMENT OF THE ISSUES....................................................................3

STATEMENT OF THE CASE.......................................................................3

    A.    Statutory Background...............................................................3

    B.    Factual Background ..................................................................5

    C.    Prior Proceedings...................................................................10

SUMMARY OF ARGUMENT....................................................................14

STANDARD OF REVIEW .........................................................................17

ARGUMENT .............................................................................................17

I.    The District Court Correctly Dismissed Plaintiffs' Complaint for Lack of Subject-Matter Jurisdiction Because There Is No Waiver of Sovereign Immunity.........................................................................17

    A.    The Challenged FDA Statements Are Not *Ultra Vires*.............18

    B.    The Challenged FDA Statements Do Not Alter Legal Rights or Responsibilities and Thus Are Not Subject to the APA's Waiver of Sovereign Immunity. ...................................................22

II.    Plaintiffs Lack Article III Standing. ........................................................30

CONCLUSION ..........................................................................................39

ADDENDUM

CERTIFICATE OF SERVICE

CERTIFICATE OF COMPLIANCE

# TABLE OF AUTHORITIES

**Cases:**                                                                                                    **Page(s)**

*Alabama-Coushatta Tribe of Tex. v. United States*,
   757 F.3d 484 (5th Cir. 2014) ................................................................ 22, 23, 25, 29

*Alabama Rural Fire Ins. Co. v. Naylor*,
   530 F.2d 1221 (5th Cir. 1976) ..................................................................... 18

*Association of Am. Physicians & Surgeons v. FDA*,
   13 F.4th 531 (6th Cir. 2021) ......................................................................... 36

*Avoyelles Sportsmen's League, Inc. v. Marsh*,
   715 F.2d 897 (5th Cir. 1983) ....................................................................... 25

*Barr v. Matteo*,
   360 U.S. 564 (1959) ..................................................................................... 19

*Bennett v. Spear*,
   520 U.S. 154 (1997) ....................................................................... 17, 23, 24

*Buckman Co. v. Plaintiffs' Legal Comm.*,
   531 U.S. 341 (2001) ............................................................................ 21, 22

*California v. Texas*,
   141 S. Ct. 2104 (2021) ............................................................................ 30-31

*Cuvillier v. Taylor*,
   503 F.3d 397 (5th Cir. 2007) ....................................................................... 17

*Dalton v. Specter*,
   511 U.S. 462 (1994) ..................................................................................... 28

*Danos v. Jones*,
   652 F.3d 577 (5th Cir. 2011) ............................................... 2, 12, 14, 17, 18

*Data Mktg. P'ship, LP v. U.S. Dep't of Labor*,
   45 F.4th 846 (5th Cir. 2022) ........................................................................ 26

*Daves v. Dallas County*,
   22 F.4th 522 (5th Cir. 2022) ........................................................................ 30

*FDA v. Brown & Williamson Tobacco Corp.*,
   529 U.S. 120 (2000) ................................................................................ 3, 19

*Federal Deposit Ins. Corp. v. Meyer*,
    510 U.S. 471 (1994)............................................................................17

*Flue-Cured Tobacco Coop. Stabilization Corp. v. EPA*,
    313 F.3d 852 (4th Cir. 2002) ...................................... 24, 28, 29

*Franklin v. Massachusetts*,
    505 U.S. 788 (1992) ............................................................... 28

*Geyen v. Marsh*,
    775 F.2d 1303 (5th Cir. 1985) ............................................. 18

*Hoxsey v. Folsom*,
    155 F. Supp. 376 (D.D.C. 1957) ..................................... 4, 19

*Independent Equip. Dealers Ass'n v. EPA*,
    372 F.3d 420 (D.C. Cir. 2004) ........................................ 23, 24

*Invention Submission Corp. v. Rogan*,
    357 F.3d 452 (4th Cir. 2004) .......................................... 24, 29

*June Med. Servs. LLC v. Russo*,
    140 S. Ct. 2103 (2020) ........................................................ 36

*Kowalski v. Tesmer*,
    543 U.S. 125 (2004) .............................................. 16, 35, 36, 37

*Larson v. Domestic & Foreign Commerce Corp.*,
    337 U.S. 682 (1949).............................................................18

*Louisiana v. United States*,
    948 F.3d 317 (5th Cir. 2020) ........................................... 17, 22

*Louisiana v. U.S. Army Corp of Eng'rs*,
    834 F.3d 574 (5th Cir. 2016) ........................................... 13, 29

*Lujan v. National Wildlife Fed'n*,
    497 U.S. 871 (1990) ........................................................ 23, 29

*Medical Mut. of Ohio v. AbbVie Inc.*,
    784 F. App'x 457 (7th Cir. 2019) ...................................... 20

*Parsons v. U.S. Dep't of Justice*,
    878 F.3d 162 (6th Cir. 2017) .......................................... 24, 28

*Pennhurst State Sch. & Hosp. v. Halderman,*
465 U.S. 89 (1984) ........................................................................ 14, 18

*Regents of the Univ. of Cal. v. Aisen,*
No. 15-cv-1766, 2016 WL 1428072 (S.D. Cal. Apr. 12, 2016) ................................. 38

*Shurtleff v. City of Boston,*
142 S. Ct. 1583 (2022) ........................................................................ 3, 19

*Sierra Club v. Peterson,*
228 F.3d 559 (5th Cir. 2000) ................................................................ 23

*Sprint Nextel Corp. v. FCC,*
508 F.3d 1129 (D.C. Cir. 2007) ............................................................ 24

*St. Tammany Par., ex rel. Davis v. Fed. Emergency Mgmt. Agency,*
556 F.3d 307 (5th Cir. 2009) .............................................................. 17-18

*Texas v. Biden,*
10 F.4th 538 (5th Cir. 2021) ............................................................ 26, 27

*Texas v. EEOC*
933 F.3d 433 (5th Cir. 2019) ............................................................ 13, 27

*Thole v. U.S. Bank N.A.,*
140 S. Ct. 1615 (2020) ........................................................................30

*States ex rel. King v. Solvay Pharm., Inc.,*
871 F.3d 318 (5th Cir. 2017) .............................................................. 20

*Vote.Org v. Callanen,*
39 F.4th 297 (5th Cir. 2022) .............................................................. 35

*Walmart Inc. v. U.S. Dep't of Justice,*
21 F.4th 300 (5th Cir. 2021) .............................................................. 22

**Statutes:**

Administrative Procedure Act (APA):
5 U.S.C. § 551(4) ............................................................................ 24
5 U.S.C. § 551(13) .......................................................................... 24
5 U.S.C. § 704 ................................................................................ 23

Federal Food, Drug, and Cosmetic Act:

    21 U.S.C. § 301 *et seq.* ........................................................................ 3

      21 U.S.C. § 355-1 ............................................................................ 5

      21 U.S.C. § 375(b) ........................................................... 2, 4, 15, 19

      21 U.S.C. § 393(b) ............................................................................ 4

      21 U.S.C. § 393(b)(1) ................................................................ 3, 15, 19

      21 U.S.C. § 393(b)(1)-(2) ...................................................... 12, 14, 19

      21 U.S.C. § 393(b)(2)(B) ................................................... 2, 3, 15, 19

      21 U.S.C. § 396 .................................................................. 5, 12, 20, 39

28 U.S.C. § 1291 .................................................................................... 3

42 U.S.C. § 242o(b) ................................................................. 2, 4, 15, 19


**Rule:**

Fed. R. App. P. 4(a)(1)(B) ...................................................................... 3


**Other Authorities:**

FDA, *FDA Staff Manual Guides, Vol II – Delegations of Authority*, SMG 1410.10
    (Feb, 22, 2023), https://www.fda.gov/media/81983/download ................................ 4

FDA, *Human Drug Compounding* (Apr. 26, 2021),
    https://perma.cc/5UGJ-KZ6M ...................................................................... 9

41 Fed. Reg. 36,281 (Aug. 27, 1976) ................................................................ 26

Merck, *Merck Statement on Ivermectin Use During the COVID-19 Pandemic*
    (Feb. 4, 2021), https://perma.cc/UZ4U-U89B ............................................ 10, 28, 33

WHO, *WHO Advises that Ivermectin Only Be Used to Treat COVID-19 Within
    Clinical Trials* (Mar. 31, 2021), https://perma.cc/HK33-ZW2C ................ 9-10, 28, 33

**INTRODUCTION**

During the COVID-19 pandemic, the U.S. Food and Drug Administration (FDA) received multiple reports of patients who required medical attention, including hospitalization, after self-medicating with ivermectin products intended for animals. In response, FDA posted an article to its website explaining to consumers that although drug products containing ivermectin have been approved for certain uses in humans and for certain other uses in animals, no drug products containing ivermectin have been approved or authorized to prevent or treat COVID-19. The article warned consumers that it could be dangerous for people to use ivermectin to prevent or treat COVID-19. FDA also posted related messages on social media. None of FDA's informational statements purports to impose any requirements, restrictions, or limitations on anyone.

Plaintiffs are doctors who prescribe or promote ivermectin to prevent or treat COVID-19. Plaintiffs brought suit challenging FDA's statements as *ultra vires* and unlawful under the Administrative Procedure Act (APA). Plaintiffs do not suggest that the challenged statements had any direct legal effect, but urge that the statements have indirectly harmed them by influencing third parties.

The district court properly dismissed plaintiffs' complaint. The district court correctly concluded that it lacked jurisdiction because there is no waiver of sovereign immunity. Plaintiffs cannot invoke the narrow *ultra vires* exception to sovereign immunity because FDA's statements informing the public about safe uses of a drug

were not "without any authority what[so]ever" or "without any colorable basis" of authority. *Danos v. Jones*, 652 F.3d 577, 583 (5th Cir. 2011). To the contrary, Congress charged FDA with "protect[ing] the public health by," among other things, "ensuring that . . . human . . . drugs are safe and effective." 21 U.S.C. § 393(b)(2)(B). As part of that mission, FDA has inherent authority to communicate information to the public. And the Federal Food, Drug, and Cosmetic Act and Public Health Service Act confirm that authority. Most relevant here, Congress expressly confirmed FDA's authority to "cause to be disseminated information regarding . . . drugs[] . . . in situations involving, in the opinion of the Secretary, imminent danger to health or gross deception of the consumer." 21 U.S.C. § 375(b); *see also* 42 U.S.C. § 242o(b). Nor can plaintiffs rely on the waiver of sovereign immunity in the APA, which does not extend to purely informational statements.

Additionally, although the district court did not reach the issue, plaintiffs cannot demonstrate standing because they failed to allege any concrete injuries that were caused by FDA's actions, not third parties, and their alleged injuries would not be redressed by a favorable decision in this case.

## STATEMENT OF JURISDICTION

The district court properly dismissed this action for lack of jurisdiction on the ground that there was no waiver of sovereign immunity. In addition, as discussed below, the district court lacked Article III jurisdiction because plaintiffs lack standing. The district court's dismissal of this suit for lack of subject-matter jurisdiction on

December 6, 2022, was a final judgment, and plaintiffs timely appealed from that judgment on December 9, 2022. ROA.1662; *see* Fed. R. App. P. 4(a)(1)(B). This Court has jurisdiction under 28 U.S.C. § 1291.

## STATEMENT OF THE ISSUES

1. Whether the district court properly dismissed plaintiffs' complaint for lack of subject-matter jurisdiction based on the absence of any waiver of sovereign immunity for a challenge to informational statements made by FDA.

2. Whether, in the alternative, the complaint was subject to dismissal for lack of standing because plaintiffs have failed to allege any actual, concrete, or certainly impending injury that is fairly traceable to FDA's informational statements regarding ivermectin and redressable by an order declaring the statements to be unlawful.

## STATEMENT OF THE CASE

### A.     Statutory Background

In the Federal Food, Drug, and Cosmetic Act (the Act), 21 U.S.C. § 301 *et seq.*, Congress charged FDA with protecting the public health by ensuring that drugs are safe and effective. 21 U.S.C. § 393(b)(1), (b)(2)(B) (describing the mission of FDA); *see FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 133-34 (2000). In furtherance of that mission, FDA has inherent authority to communicate information to the public. *See Shurtleff v. City of Boston*, 142 S. Ct. 1583, 1589 (2022) ("When the government wishes to state an opinion, to speak for the community, to formulate policies, or to implement programs, it naturally chooses what to say and what not to

say.  That must be true for government to work." (internal citation omitted)); *see also*

*Hoxsey v. Folsom*, 155 F. Supp. 376, 378 (D.D.C. 1957).  The Act, as well as the Public

Health Service Act, confirm FDA's inherent authority to inform the public.  *See* 21

U.S.C. § 393(b)*; see also* 42 U.S.C. § 242o(b).[1]  The Act expressly recognizes FDA's

power to educate the public by "collecting, reporting, and illustrating the results of

[its] investigations."  21 U.S.C. § 375(b).  The Act also expressly permits FDA to

"cause to be disseminated information regarding . . . drugs[] . . . in situations

involving, in the opinion of the Secretary, imminent danger to health or gross

deception of the consumer."  *Id.*

    FDA regulates the manufacturing and distribution of drugs and medical

devices.  FDA's longstanding position is that, in general, the agency does not regulate

the practice of medicine, meaning that with certain limited exceptions, health-care

professionals may choose to prescribe or use a legally marketed human drug for an

unapproved use (sometimes referred to as "off-label" use) when they judge that the

---

[1] The Secretary of Health and Human Services has redelegated to the Commissioner of Food and Drugs functions vested in the Secretary under Section 242o(b) of the Public Health Service Act to issue information related to health for the use of the public and other pertinent health information for the use of persons and institutions concerned with health services when such information is related to the functions of the FDA.  FDA, *FDA Staff Manual Guides, Vol II – Delegations of Authority*, SMG 1410.10, Sec. 1.A, ¶ 22 (Feb, 22, 2023), https://www.fda.gov/media/81983/download.

unapproved use is medically appropriate for an individual patient.[2]  In the context of

medical devices, the Act states that "[n]othing in this chapter shall be construed to

limit or interfere with the authority of a health care practitioner to prescribe or

administer any legally marketed device to a patient for any condition or disease within

a legitimate health care practitioner-patient relationship."  21 U.S.C. § 396.

## B.      Factual Background

FDA has approved several drug products containing ivermectin to treat various

health conditions.  For example, FDA has approved drug products containing

ivermectin for human use to treat parasites and certain skin conditions.  ROA.973.

FDA also has approved different drug products containing ivermectin for animal use.

ROA.973.  For example, animal ivermectin is approved to prevent canine and feline

heartworm disease and to treat certain other parasites in animals.  ROA.973.  Anti-

parasitic ivermectin products for horses and cattle are available without a prescription.

During the COVID-19 pandemic, FDA received multiple reports of patients

who required medical attention, including hospitalization, after self-medicating with

ivermectin products intended for use in horses.  ROA.973, 1238.  In response, FDA

made public statements warning consumers of the dangers of using ivermectin to

prevent or treat COVID-19 in humans.  None of these statements purports to impose

---

[2] In certain circumstances, FDA imposes restrictions on prescribing approved drugs.  *See, e.g.,* 21 U.S.C. § 355-1 (authorizing FDA to require risk mitigation measures for certain drugs to help ensure that those drugs' benefits outweigh their risks).

any legal requirements on anyone, and, in particular, none of them requires doctors to refrain from prescribing ivermectin products to prevent or treat COVID-19.

FDA first posted an article titled "Why You Should Not Use Ivermectin to Treat or Prevent COVID-19" on March 5, 2021. ROA.1238. The article noted the "growing interest" in using ivermectin to treat COVID-19 and indicated that "[t]he FDA has received multiple reports of patients who have required medical support and been hospitalized after self-medicating with ivermectin intended for horses." ROA.1238. The article described the approved uses for ivermectin products for humans and the approved uses for different ivermectin products for animals, but indicated that "FDA has not approved ivermectin for use in treating or preventing COVID-19 in humans." ROA.1238, ROA.1240. It also explained that "FDA has not reviewed data to support use of ivermectin in COVID-19 patients to treat or to prevent COVID-19" and that "some initial research is underway." ROA.1239. It cautioned consumers that "[t]aking a drug for an unapproved use can be very dangerous." ROA.1239.

The article further warned consumers that they should "[n]ever use medications intended for animals on [themselves]" and that "[i]vermectin preparations for animals are very different from those approved for humans." ROA.1239. It explained that "animal drugs are often highly concentrated because they are used for large animals like horses and cows, which can weigh a lot more than [humans] do" and that "[s]uch high doses can be highly toxic in humans." ROA.1239.

The current version of the article has been online since September 7, 2021. It contains much of the same content but does not contain the statement that FDA has not yet "reviewed data to support [the] use of ivermectin" to prevent or treat COVID-19 and instead emphasizes that FDA has not approved ivermectin to prevent or treat COVID-19 or granted emergency use authorization for that use. ROA.973. The original version of the article stated, "If you have a prescription for ivermectin for an FDA-approved use, get it from a legitimate source and take it exactly as prescribed." ROA.1239. The September 7, 2021 version of the article has been revised to state, "If your health care provider writes you an ivermectin prescription, fill it through a legitimate source such as a pharmacy, and take it *exactly* as prescribed." ROA.973. It also recommends that consumers "[t]alk to [their] health care provider[s] about available COVID-19 vaccines and treatment options," explaining that "[y]our provider can help determine the best option for you, based on your health history." ROA.974.

FDA publicized its article on Twitter with tweets linking to the article. One tweet states, "You are not a horse. You are not a cow. Seriously, y'all. Stop it." ROA.981. Another tweet states, "Hold your horses, y'all. Ivermectin may be trending, but it still isn't authorized or approved to treat COVID-19." ROA.990. Similarly, FDA posted on Instagram an image of a horse with the caption: "You are not a horse. Stop it with the #Ivermectin. It's not authorized for treating #COVID." ROA.988.

On April 10, 2020, FDA posted on its website a frequently-asked-questions webpage titled "FAQ: COVID-19 and Ivermectin Intended for Animals." ROA.976. The FAQ answers questions for consumers, such as "Should I take ivermectin to prevent or treat COVID-19?" ROA.976. The FAQ explains that "[t]here are approved uses of ivermectin in people and animals[,] but it is not approved for the prevention or treatment of COVID-19." ROA.976. It advises that "[d]ata from clinical trials are necessary for [FDA] to determine whether ivermectin is safe and effective in treating or preventing COVID-19." ROA.976. The FAQ notes that although "[a] recently released research article described the effect of ivermectin on SARS-CoV-2 in a laboratory setting," "[a]dditional testing is needed to determine whether ivermectin might be appropriate to prevent or treat . . . COVID-19." ROA.976 (citation omitted).

The FAQ recognizes the role of health-care providers, advising consumers "not [to] take any medicine to treat or prevent COVID-19 unless it has been prescribed to you by your health care provider and acquired from a legitimate source." ROA.976. Finally, the FAQ explains that "[p]eople should never take animal drugs" because that "could cause serious harm." ROA.976. FDA also posted to its website a similar FAQ on a webpage titled "COVID-19 Frequently Asked Questions" that advises against taking ivermectin "for the prevention or treatment of COVID-19." ROA.979. It explains that ivermectin was not "approved or authorized" for those uses and includes a link to the FDA article on this topic. ROA.979.

FDA also sent a letter to the Federation of State Medical Boards and the National Association of Boards of Pharmacy. ROA.1256-1257.[3] The letter does not say anything about whether physicians can prescribe ivermectin to prevent or treat COVID-19. Instead, the letter explains that "FDA has received complaints about compounding pharmacies selling drug products containing ivermectin, claiming that they can treat or prevent COVID-19."[4] ROA.1256. The letter explains that "FDA has neither authorized nor approved any ivermectin drug product for use in preventing or treating COVID-19." ROA.1256.

Other organizations, such as the World Health Organization (WHO), the American Medical Association (AMA), the American Society of Health-System Pharmacists (ASHP), the Centers for Disease Control and Prevention (CDC), and Merck (the sponsor of certain ivermectin products) have issued statements recommending against using ivermectin to prevent or treat COVID-19. Some of these statements were issued prior to the FDA statements. ROA.1149, 1263-1264; WHO, *WHO Advises that Ivermectin Only Be Used to Treat COVID-19 Within Clinical*

---

[3] It is unclear whether plaintiffs are challenging this letter. *See* ROA.927, ¶ 4 (complaint listing challenged FDA statements and not including this letter).
[4] Generally, drug compounding is a practice in which a licensed pharmacist combines ingredients of a drug to create a medication tailored to the needs of an individual patient. FDA, *Human Drug Compounding* (Apr. 26, 2021), https://perma.cc/5UGJ-KZ6M.

*Trials* (Mar. 31, 2021);[5] Merck, *Merck Statement on Ivermectin Use During the COVID-19 Pandemic* (Feb. 4, 2021).[6]

### C. Prior Proceedings

1.　Plaintiffs are three doctors who prescribed ivermectin or promoted its use to prevent or treat COVID-19.　Plaintiff Robert Apter is a doctor who "has frequently prescribed ivermectin to [his] patients."　ROA.931, ¶ 13.　Dr. Apter alleges that FDA's statements "have interfered with his ability to exercise professional medical judgment in practicing medicine."　ROA.932, ¶ 14.　He alleges that pharmacists have refused to fill ivermectin prescriptions for his patients, citing FDA's statements.　ROA.932, ¶ 15.　He also alleges that "insurance companies are refusing to pay for ivermectin to treat COVID-19, and the only observable basis for this is pronouncements and pressure from the FDA."　ROA.932, ¶ 17.　Dr. Apter alleges that he has been referred to two state medical boards "for disciplinary proceedings for prescribing ivermectin to treat COVID-19" and that "[t]he referrals include copies of the FDA's publications directing against the use of ivermectin to treat COVID-19."　ROA.932-933, ¶ 18.

　　　Plaintiff Mary Talley Bowden is a doctor who prescribes ivermectin to treat COVID-19.　ROA.933-935, ¶¶ 19-29.　She alleges that she "was derided by Houston Methodist Hospital and forced to resign her privileges there as a result" of her

[5] https://perma.cc/HK33-ZW2C.
[6] https://perma.cc/UZ4U-U89B.

decision to recommend ivermectin to treat COVID-19.  ROA.933, ¶ 21.  Dr. Bowden

continues to treat COVID-19 patients and to prescribe ivermectin.  ROA.933-935,

¶¶ 22-29.  She alleges that the FDA statements have harmed her "ability to practice

medicine and treat patients" and that pharmacists have refused to fill ivermectin

prescriptions for her patients, "citing FDA directives not to use the drug to treat

COVID-19."  ROA.934, ¶¶ 24, 27.  Dr. Bowden further alleges that patients have

delayed seeking treatment because of the FDA statements.  ROA.935, ¶ 29.

Plaintiff Paul Marik is a critical care specialist who has promoted the use of

ivermectin to treat COVID-19.  ROA.935-938, ¶¶ 30, 39, 42.  Dr. Marik alleges that

he was forced to resign from his positions at a medical school and a hospital "for

promoting the use of ivermectin—as well as other safe, cheap, and effective off-label

FDA-approved drugs—to treat COVID-19" following FDA's statements.  ROA.938,

¶ 42.

Plaintiffs brought suit against the U.S. Department of Health and Human

Services (HHS), the Secretary of HHS, FDA, and the FDA Commissioner.  Plaintiffs

allege that FDA's statements are *ultra vires* and unlawful under the APA.  ROA.962-

968, ¶¶ 129-156.  Plaintiffs asked the court to hold unlawful and set aside the FDA

statements and issue declaratory and injunctive relief prohibiting FDA from

interfering with the practice of medicine and issuing statements about "whether health

professionals should use ivermectin off-label to treat patients."  ROA.968-969.  The

government moved to dismiss, arguing that plaintiffs lack standing and that there is

no waiver of sovereign immunity because the challenged FDA statements are not "agency action," let alone "final agency action" under the APA. ROA.1441-1479.

2. The district court granted the government's motion to dismiss. The court did not reach the Article III standing question, instead resolving the case on the alternative jurisdictional ground that there was no waiver of sovereign immunity. First, the district court concluded that the *ultra vires* doctrine's narrow exception to sovereign immunity does not apply. ROA.1650-1653. The court reasoned that to be *ultra vires*, an act must be "without any authority whatsoever or be made without any colorable basis for authority." ROA.1652 (citing *Danos v. Jones*, 652 F.3d 577, 583 (5th Cir. 2011)). As the court explained, "it cannot be said that the FDA had no colorable basis of authority," as "[t]he FDA is charged by Congress with protecting public health and ensuring that regulated medical products are safe and effective." ROA.1652-1653 (citing 21 U.S.C. § 393(b)(1)-(2)). The court noted that "plaintiffs do not dispute that the FDA has the authority, generally, to make public statements in-line with these purposes." ROA.1653. The court also rejected plaintiffs' argument that 21 U.S.C. § 396 limited FDA's authority in this area, noting that the cited provision applies to devices and not to drugs. ROA.l652.

Second, the district court concluded that the APA's waiver of sovereign immunity does not apply because the FDA statements are not final agency action. ROA.1653; *see also* ROA.1647-1649. The court reasoned that "[a]ssuming arguendo that the statements were in fact agency action," "the statements do not rise to the

12

level of *final* agency action." ROA.1654. "None of the statements determine rights,

obligations, or legal consequences." ROA.1655. And "at least some of the

statements do not mark the consummation of the agency's decisionmaking process,"

ROA.1654, but instead "include language indicating that they were made based on

'[c]urrently available data,' '[a]dditional testing [was] needed,' '[c]linical trials [were]

ongoing,' and 'initial research [was] underway,'" ROA.1655 (alterations in original).

As the court explained, "there is no indication the FDA has adopted a legal position,

no indication of any future liability on non-complying parties, and no establishment of

safe harbors." ROA.1658.

The court rejected plaintiffs' reliance on *Texas v. EEOC*, 933 F.3d 433, 441-443

(5th Cir. 2019). ROA.1657-1659. It reasoned that unlike the guidance documents in

*Texas v. EEOC*, the FDA statements do not bind the agency, as they "do not outline

the agency's legal position on a doctor's authority to prescribe ivermectin . . . and the

possible consequences of doing so, or how a doctor can avoid facing liability for

prescribing ivermectin, or use any similar language indicating that the statements

determine rights, obligations, or legal consequences." ROA.1659. The court also

rejected plaintiffs' reliance on *Louisiana v. U.S. Army Corp of Engineers*, 834 F.3d 574,

583 (5th Cir. 2016), in which this Court explained that final agency actions "normally

affect a regulated party's possible legal liability; these consequences tend to expose

parties to civil or criminal liability for non-compliance with the agency's view of the

law." ROA.1659 (quoting *Louisiana*, 834 F.3d at 583). As the court explained, "the

13

FDA's statements do not state the FDA's view of the law or create civil or criminal liability for noncompliance." ROA.1659-1660. "A state-medical-board investigation and losing one's job—at the hands of non-agency third parties—are not the types of consequences that meet the finality requirement." ROA.1660.

Plaintiffs filed a timely notice of appeal. ROA.1667.

## SUMMARY OF ARGUMENT

Plaintiffs' claims fail on multiple threshold grounds. We address the lack of a waiver of sovereign immunity first because the district court ruled on that issue. Additionally, plaintiffs lack Article III standing. This Court can affirm on either ground.

I. The district court properly dismissed plaintiffs' complaint for lack of subject-matter jurisdiction because there is no waiver of sovereign immunity. Plaintiffs cannot invoke the *ultra vires* exception to sovereign immunity because they have not alleged "facts sufficient to establish that the officer was acting 'without any authority what[so]ever,' or without any 'colorable basis for the exercise of authority.'" *Danos v. Jones*, 652 F.3d 577, 583 (5th Cir. 2011) (quoting *Pennhurst State Sch. & Hosp. v. Halderman,* 465 U.S. 89, 101 n.11 (1984)). As the district court explained, "FDA is charged by Congress with protecting public health and ensuring that regulated medical products are safe and effective." ROA.1652-1653 (citing 21 U.S.C. § 393(b)(1)-(2)). FDA has inherent authority to further that mission by communicating information to the public, and that authority is expressly confirmed by provisions in the Federal

Food, Drug, and Cosmetic Act and the Public Health Service Act. *See* 21 U.S.C. §§ 375(b), 393(b)(1), 393(b)(2)(B); *see also* 42 U.S.C. § 242o(b). In particular, Congress made FDA's authority to issue statements of the kind at issue here explicit by expressly authorizing the agency to "cause to be disseminated information regarding food, drugs, devices, tobacco products, or cosmetics in situations involving, in the opinion of the Secretary, imminent danger to health or gross deception of the consumer." 21 U.S.C. § 375(b).

The APA's waiver of sovereign immunity does not apply because FDA's statements are not "final agency action" within the meaning of the APA. FDA's statements do not alter legal rights or responsibilities and are instead purely informational.

II.     Plaintiffs advance three theories of standing based on (1) alleged injuries caused by independent third parties, (2) alleged injuries to plaintiffs' patients, and (3) alleged injuries related to the practice of medicine. Each theory is meritless.

First, as to the alleged injuries caused by independent third parties, plaintiffs have failed to allege any concrete injury that is fairly traceable to FDA's statements. FDA's statements did not impose regulatory requirements on plaintiffs or anyone else, and instead merely provided recommendations. And even those recommendations were not directed at plaintiffs or at the entities—such as medical boards or employers—alleged to have caused injuries to plaintiffs. Instead, FDA's statements generally recommended that consumers not take ivermectin to prevent or

15

treat COVID-19, noting that patients had become sick after self-medicating with animal versions of ivermectin. There is no basis for plaintiffs' speculation that the actions of independent third parties are fairly traceable to FDA's recommendations to consumers, particularly in light of statements by other organizations that similarly recommended against using ivermectin to prevent or treat COVID-19.

Additionally, these alleged injuries are not likely redressable by an order declaring the FDA statements unlawful. It is once again speculative that a judicial decree regarding FDA's statements regarding the use of ivermectin—one of many such statements made in the scientific community—would change the independent third parties' scientific understanding of the risks and benefits of using ivermectin to prevent or treat COVID-19 or convince the third parties to reverse the actions that allegedly harmed plaintiffs.

Second, plaintiffs cannot demonstrate standing based on alleged injuries to their patients. In addition to the problems identified above, and even assuming plaintiffs can demonstrate a "close relationship" to their patients, they have not alleged any "hindrance" to their patients' ability to protect their own interests. *Kowalski v. Tesmer*, 543 U.S. 125, 130 (2004).

Third, plaintiffs cannot demonstrate standing based on their allegations that the FDA statements have harmed their "ability to practice medicine." ROA.934, ¶ 24. These vague allegations do not demonstrate a concrete injury, and plaintiffs allege that

they have continued to prescribe ivermectin to prevent or treat COVID-19. *See, e.g.,* ROA.931, ¶ 13; ROA.933, ¶ 22; ROA.934, ¶ 36.

## STANDARD OF REVIEW

The district court's dismissal of this case is reviewed de novo. *See Louisiana v. United States*, 948 F.3d 317, 320 (5th Cir. 2020).

## ARGUMENT

I. **The District Court Correctly Dismissed Plaintiffs' Complaint for Lack of Subject-Matter Jurisdiction Because There Is No Waiver of Sovereign Immunity.**

This Court should affirm the district court's dismissal, as the district court correctly concluded that there is no waiver on sovereign immunity. Alternatively, this Court can affirm for the independent reason that plaintiffs lack Article III standing. Plaintiffs have briefed the issue, and this Court may affirm the district court's judgment on any grounds that were properly raised and supported by the record, including grounds not relied on by the district court. *Cuvillier v. Taylor*, 503 F.3d 397, 401 (5th Cir. 2007); *see Bennett v. Spear*, 520 U.S. 154, 166-67 (1997). Because the district court based its decision on sovereign immunity, we begin with that issue.

"A federal court has no subject matter jurisdiction over claims against the United States unless the government waives its sovereign immunity and consents to suit." *Danos v. Jones*, 652 F.3d 577, 581 (5th Cir. 2011) (citing *Federal Deposit Ins. Corp. v. Meyer*, 510 U.S. 471, 475 (1994)). Plaintiffs have not met their burden to demonstrate a waiver of sovereign immunity. *See St. Tammany Par., ex rel. Davis v. Fed.*

*Emergency Mgmt. Agency*, 556 F.3d 307, 315 (5th Cir. 2009) ("Plaintiff bears the burden of showing Congress's unequivocal waiver of sovereign immunity.").

## A.     The Challenged FDA Statements Are Not *Ultra Vires.*

The *ultra vires* exception to sovereign immunity provides that "where the officer's powers are limited by statute, his actions beyond those limitations are considered individual and not sovereign actions." *Danos*, 652 F.3d at 583 (quoting *Larson v. Domestic & Foreign Commerce Corp.*, 337 U.S. 682, 689 (1949)). Even assuming the *ultra vires* exception survives the 1976 amendments to the APA, plaintiffs do not satisfy the demanding standard to invoke this narrow exception. *See Geyen v. Marsh*, 775 F.2d 1303, 1307 (5th Cir. 1985) (raising substantial doubt that an *ultra vires* action survives the 1976 Amendments to the APA).

"To invoke this exception, a plaintiff must 'do more than simply allege that the actions of the officer are illegal or unauthorized.'" *Danos*, 652 F.3d at 583 (quoting *Alabama Rural Fire Ins. Co. v. Naylor*, 530 F.2d 1221, 1226 (5th Cir. 1976)). "The complaint must allege facts sufficient to establish that the officer was acting 'without any authority what[so]ever,' or without any 'colorable basis for the exercise of authority.'" *Id.* (quoting *Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 101 n.11 (1984)).

FDA did not act "without any authority what[so]ever" or "without any colorable basis" of authority. *Danos*, 652 F.3d at 583 (quotation marks omitted). As the district court explained, "FDA is charged by Congress with protecting public

health and ensuring that regulated medical products are safe and effective."

ROA.1652-1653 (citing 21 U.S.C. § 393(b)(1)-(2)); *see also FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 133-34 (2000). In furtherance of that mission, FDA has inherent authority to communicate information to the public. *See Shurtleff v. City of Boston*, 142 S. Ct. 1583, 1589 (2022) ("When the government wishes to state an opinion, to speak for the community, to formulate policies, or to implement programs, it naturally chooses what to say and what not to say. That must be true for government to work." (internal citation omitted)); *Hoxsey v. Folsom*, 155 F. Supp. 376, 378 (D.D.C. 1957) (FDA could "disseminate information" about plaintiff's products "even without statutory authority"); *cf. Barr v. Matteo*, 360 U.S. 564, 574-575 (1959) (plurality opinion) (finding implicit authority for public officials to make "public statement of agency policy in respect to matters of wide public interest and concern"). Provisions in the Federal Food, Drug, and Cosmetic Act and the Public Health Service Act confirm that authority. *See* 21 U.S. §§ 375(b), 393(b)(1), 393(b)(2)(B); 42 U.S.C. §242o(b). For example, the Act explicitly recognizes FDA's power to educate the public by "collecting, reporting, and illustrating the results of [its] investigations." 21 U.S.C. § 375(b). The Act also expressly permits FDA to "cause to be disseminated information regarding . . . drugs[] . . . in situations involving, in the opinion of the Secretary, imminent danger to health or gross deception of the consumer." *Id.*; *see also* 42 U.S.C. § 242o(b) ("From time to time the [FDA] shall issue information related to

public health, in the form of publications or otherwise, for the use of the public . . . .").

Additionally, the district court correctly rejected plaintiffs' argument that the FDA statements violated 21 U.S.C. § 396 and were thus *ultra vires*. ROA.1650-1652. Section 396 states that "[n]othing in this chapter shall be construed to limit or interfere with the authority of a health care practitioner to prescribe or administer any legally marketed device." 21 U.S.C. § 396. But FDA did not assert authority to limit plaintiffs' ability to prescribe or administer devices, so the provision by its own terms has no application.

Plaintiffs argue that Section 396 has been discussed in the context of drugs, but the cases on which plaintiffs rely merely stand for the proposition that FDA generally does not interfere with doctors' prescribing approved drugs to their patients for off-label use. *See, e.g.*, *United States ex rel. King v. Solvay Pharm., Inc.*, 871 F.3d 318, 328 (5th Cir. 2017) (per curiam) ("FDA does not restrict physicians from prescribing an otherwise FDA-approved drug for an off-label use. *See* 21 U.S.C. § 396."); *Medical Mut. of Ohio v. AbbVie Inc.*, 784 F. App'x 457, 457 (7th Cir. 2019) (citing 21 U.S.C. § 396 for the proposition that "[p]hysicians are free to prescribe drugs for off-label uses, but manufacturers are forbidden to promote those uses"). And FDA did not do so here. To the contrary, plaintiffs allege that they have continued to prescribe ivermectin and have not alleged that FDA has attempted or threatened any enforcement action against them. ROA.933-934, ¶¶ 22, 26 (alleging that Dr. Bowden

"continues to treat COVID-19 patients" and that "[o]ther doctors have referred patients to Dr. Bowden specifically because she prescribes ivermectin to treat COVID-19"); ROA.931, ¶ 13 (alleging that Dr. Apter "has completed over 6,000 patient consultations for COVID-19" and "has frequently prescribed ivermectin to these patients").

In fact, the September 2021 article and April 2020 FAQ acknowledge that doctors have discretion to prescribe human ivermectin products. The September 2021 article states that "[i]f your health care provider writes you an ivermectin prescription, fill it through a legitimate source such as a pharmacy, and take it *exactly* as prescribed." ROA.973. It also recommends that consumers "[t]alk to [their] health care provider[s] about available COVID-19 vaccines and treatment options," explaining that "[y]our provider can help determine the best option for you, based on your health history." ROA.974. The April 2020 FAQ advises consumers "not [to] take any medicine to treat or prevent COVID-19 unless it has been prescribed to you by your health care provider and acquired from a legitimate source." ROA.976.

Plaintiffs argue that "the Supreme Court has recognized [that] Section 396 encompasses . . . anything that would 'deter off-label use.'" Pls.' Br. 33, 35 (emphasis omitted) (quoting *Buckman Co. v. Plaintiffs' Legal Comm.*, 531 U.S. 341, 350 (2001)). That is incorrect. The Court held in *Buckman* that state-law fraud-on-the-FDA claims were preempted by the Federal Food, Drug, and Cosmetic Act, noting that permitting these state-law claims to go forward could deter manufacturers from seeking FDA

approval for devices with potentially beneficial off-label uses for fear of being exposed to civil liability under state law, thus "deter[ring] off-label use." 531 U.S. at 350. The Supreme Court did not consider or address whether Section 396 prohibits FDA from doing anything that would deter off-label use of drugs, which would presumably encompass a wide range of conduct that could not plausibly be unlawful, much less the proper subject of an *ultra vires* claim on the ground that it lacks any colorable basis. For the same reasons, plaintiffs' suggestion that FDA has impermissibly interfered with the practice of medicine is meritless. Pls.' Br. 25-32.

## B. The Challenged FDA Statements Do Not Alter Legal Rights or Responsibilities and Thus Are Not Subject to the APA's Waiver of Sovereign Immunity.

The district court also correctly concluded that the APA's waiver of sovereign immunity does not apply. ROA.1653; *see also* ROA.1647-1649. As the district court recognized, "Section 702 of the APA 'waives sovereign immunity for actions against federal government agencies, seeking nonmonetary relief, if the agency conduct is otherwise subject to judicial review.'" ROA.1647 (quoting *Louisiana v. United States*, 948 F.3d 317, 321 (5th Cir. 2020)). This Court has held that "Section 702 contains two separate requirements for establishing a waiver of sovereign immunity." *Alabama-Coushatta Tribe of Tex. v. United States*, 757 F.3d 484, 489 (5th Cir. 2014); *see also Walmart Inc. v. U.S. Dep't of Justice*, 21 F.4th 300, 308 (5th Cir. 2021). "First, the plaintiff must identify some 'agency action' affecting him in a specific way[] . . . ." *Alabama-Coushatta*, 757 F.3d at 489. "Second, the plaintiff must show that he has 'suffered

legal wrong because of the challenged agency action[] . . . .'" *Id.* (quoting *Lujan v. National Wildlife Fed'n*, 497 U.S. 871, 883 (1990)); *see also* ROA.1647-1648. Plaintiffs cannot satisfy either requirement because FDA here merely issued informational statements and did not alter any legal rights or responsibilities.

Where review is sought "under the general review provisions of the APA, the 'agency action' in question must be 'final agency action.'" *Lujan*, 497 U.S. at 882; *see also* 5 U.S.C. § 704. To be final within the meaning of the APA, an agency action must "mark the consummation of the agency's decisionmaking process," and it must be one "by which rights or obligations have been determined, or from which legal consequences will flow." *Sierra Club v. Peterson*, 228 F.3d 559, 565 (5th Cir. 2000) (quoting *Bennett*, 520 U.S. at 178).

Here, as the district court explained, "[n]one of the statements determine rights, obligations, or legal consequences." ROA.1655. "[T]here is no indication the FDA has adopted a legal position, no indication of any future liability on non-complying parties, and no establishment of safe harbors." ROA.1658. Instead, the statements are "purely informational in nature; [they] imposed no obligations and denied no relief." *Independent Equip. Dealers Ass'n v. EPA*, 372 F.3d 420, 427 (D.C. Cir. 2004). "Compelling no one to do anything, [they] had no binding effect whatsoever . . . ." *Id.* They are therefore not final agency action.

For similar reasons, the statements do not constitute "rules" under the APA because they were not "designed to implement, interpret, or prescribe law or policy."

5 U.S.C. § 551(4). Nor are they any other form of "agency action," which the APA

defines as "the whole or a part of an agency rule, order, license, sanction, relief, or the

equivalent or denial thereof, or failure to act." *Id.* § 551(13). Numerous courts have

recognized that informational statements by agencies do not qualify as agency actions

because they have no legal consequences. *See Sprint Nextel Corp. v. FCC*, 508 F.3d

1129, 1132 (D.C. Cir. 2007) ("purely informational" press release was not reviewable

agency action (quoting *Independent Equip. Dealers Ass'n*, 372 F.3d at 427)); *see also Parsons

v. U.S. Dep't of Justice*, 878 F.3d 162, 169 (6th Cir. 2017) (holding that a National Gang

Intelligence Center informational report was not final agency action and noting that

"many courts have rejected the argument that legal consequences flow from an

informational report"); *Invention Submission Corp. v. Rogan*, 357 F.3d 452, 459 (4th Cir.

2004) (holding that an advertising campaign by the U.S. Patent and Trademark Office

that warned of invention promotion scams was not final agency action); *Flue-Cured

Tobacco Coop. Stabilization Corp. v. EPA*, 313 F.3d 852, 861 (4th Cir. 2002) (holding that

an Environment Protection Agency (EPA) report about the health hazards of second-

hand tobacco smoke was not final agency action because the report did not give rise

to "direct and appreciable legal consequences" (quoting *Bennett*, 520 U.S. at 178)).

Rather than exercising any regulatory authority, FDA's statements

communicated the agency's views about the risks of using ivermectin to prevent or

treat COVID-19 and conveyed its nonbinding advice that consumers "should not use

ivermectin" for that purpose. ROA.972, 1238. The challenged statements do not

state that consumers "may not" or "must not" use ivermectin to prevent or treat COVID-19 or that doctors are prohibited from prescribing ivermectin for this purpose. Accordingly, there is no "agency action," and the waiver of sovereign immunity does not apply. *Alabama-Coushatta*, 757 F.3d at 489.

Plaintiffs protest that "FDA has taken an official position" "that ivermectin should not be used to treat or prevent COVID-19" and "direct[ed] the public not to use ivermectin for that purpose." Pls.' Br. 41. It is not clear what legal theory underlies plaintiffs' assertion regarding FDA's alleged "official position." FDA expressed its view on the safety and efficacy of using ivermectin to prevent or treat COVID-19, but had no occasion to have an "official position" in any formal sense because FDA was not taking any agency action, as defined in the APA. Similarly, FDA's informational statements do not "direct" consumers, or any anyone else, to do or refrain from doing anything.

The cases plaintiffs cite are not to the contrary. Plaintiffs strip from its context the statement in *Avoyelles Sportsmen's League, Inc. v. Marsh*, 715 F.2d 897, 908 (5th Cir. 1983), that "[t]he APA defines the term 'rule' broadly enough to include virtually every statement an agency may make." Pls.' Br. 40 (alteration in original) (quoting *Avoyelles Sportsmen's League*, 715 F.2d at 908). The Court was referring to statements by agencies regarding their own activities, resolving a dispute about whether the EPA's change in its wetland methodology was a legislative rule subject to notice and comment or an interpretative rule. *Avoyelles Sportsmen's League*, 715 F.2d at 908. The

Court did not remotely suggest, in contrast to longstanding doctrine set out by the Supreme Court, this Court, and other courts of appeals, that even purely informational utterances by agencies constitute final agency action even if they have no conceivable legal effect.

Plaintiffs fare no better in relying on *Data Marketing Partnership, LP v. U.S. Department of Labor*, 45 F.4th 846 (5th Cir. 2022). That case contrasted the advisory opinion that was before the Court, which the Court held was final agency action, with so-called "information letters" that the agency might have issued as an alternative, which would not have been final agency action. *Id.* at 852. The information letters at issue there provided information about the agency's construction of the statute it is charged with administering for the benefit of regulated parties. *See* 41 Fed. Reg. 36,281, 36,282 (Aug. 27, 1976) (information letter "call[s] attention to a well-established interpretation or principle of the Act"), *cited in Data Mktg. P'ship*, 45 F.4th at 852. The informational statements at issue here directed to nonregulated entities bear little resemblance to the information letters at issue in *Data Marketing Partnerships*. But even as to those documents, the point this Court made was that they were not final agency action under the APA—as distinguished from advisory opinions that had a legal effect—rather than that they should be treated as agency actions. Similarly, *Texas v. Biden*, 10 F.4th 538, 550 (5th Cir. 2021) (per curiam), related to a "policy statement" that was held to "withdraw[] an entity's previously-held discretion"—a far cry from the statements at issue here that have no discernable effect on FDA's policy

26

or on anyone's discretion. *Id.* (quoting *Texas v. EEOC*, 933 F.3d 433, 442 (5th Cir. 2019)).

Citing this Court's decision in *Texas v. EEOC*, 933 F.3d at 433, plaintiffs argue that the FDA statements are final agency action because they have a "'practical binding effect' on doctors across the country" and "dictate a 'norm' for doctors to follow." Pls.' Br. 48-49 (quoting 933 F.3d at 442-44). But in *Texas v. EEOC*, the challenged guidance was binding on the agency and "explicitly declare[d] that it [wa]s intended to be a playbook for employers to use to avoid liability." 933 F.3d at 444. This Court thus concluded that the guidance "carrie[d] legal consequences and dictate[d] employers' rights and obligations." *Id.* at 443. In contrast, the FDA statements at issue here, as the district court explained, "do not outline the agency's legal position on a doctor's authority to prescribe ivermectin to patients and the possible consequences of doing so, or how a doctor can avoid facing liability for prescribing ivermectin, or use any similar language indicating that the statements determine rights, obligations, or legal consequences." ROA.1659.

Plaintiffs also argue that "governing entities are regularly relying on" the FDA statements "to establish the appropriate medical care and dictate the practice of medicine" and that the guidance "concretely harms doctors." Pls.' Br. 47-50. But FDA was merely one among many entities with scientific expertise delivering the same message. Other organizations, such as the World Health Organization, the American Medical Association, the American Society of Health-System Pharmacists,

27

the Centers for Disease Control and Prevention, and Merck (the sponsor of certain ivermectin products) have issued statements recommending against using ivermectin to prevent or treat COVID-19. ROA.1149 (statement from Sentara Healthcare citing statements from other organizations); ROA.1263-1264; *WHO Advises that Ivermectin Only Be Used to Treat COVID-19 Within Clinical Trials*, *supra*; *Merck Statement on Ivermectin Use During the COVID-19 Pandemic*, *supra*. FDA's statements in no sense "establish" any standard or "dictate" any practice. Rather, third parties "were not bound by" the FDA statements "nor were they required to consider" them. *Parsons*, 878 F.3d at 170 (informational report did not "result in legal consequences because the harms that [the plaintiffs] suffered were caused by third parties who discretionarily relied on" the report).

Indeed, the Supreme Court has made clear that agency action is not made reviewable under the APA even if it tends to influence third parties. *See Dalton v. Specter*, 511 U.S. 462 (1994) (agency report was not final agency action even though it influenced the President's decision); *Franklin v. Massachusetts*, 505 U.S. 788, 798-799 (1992) (informational report was not final agency action because it had no direct legal effect until transmitted to Congress by the President, making the President's conduct the relevant action); *see also Flue-Cured Tobacco*, 313 F.3d at 860 ("[E]ven when agency action significantly impacts the choices available to the final decisionmaker, this distinction does not transform the challenged action into reviewable agency action

under the APA."); *Invention Submission Corp.*, 357 F.3d at 460 (indirect adverse effects

do not "transform the agency's conduct into final agency action under the APA").

Plaintiffs also argue that FDA's statements "tend to expose" health-care

professionals to legal consequences for noncompliance. Pls.' Br. 49 (quoting *Louisiana*

*v. U.S. Army Corps of Eng'rs*, 834 F.3d 574, 583 (5th Cir. 2016)). But as the district

court explained, "FDA's statements do not state the FDA's view of the law or create

civil or criminal liability for noncompliance." ROA.1659-1660. "A state-medical-

board investigation and losing one's job—at the hands of non-agency third parties—

are not the types of consequences that meet the finality requirement." ROA.1660; *see*

*also Flue-Cured Tobacco*, 313 F.3d at 861 (explaining that "decisions . . . attributable to

independent responses and choices of third parties" are not the type of consequences

required by the finality inquiry).

For similar reasons, plaintiffs have also failed to demonstrate that they

"suffered legal wrong because of" the FDA statements. *Alabama-Coushatta*, 757 F.3d

at 488-489 (quoting *Lujan*, 497 U.S. at 883) (explaining that to invoke the waiver of

sovereign immunity in Section 702 of the APA, a "plaintiff must show that he has

'suffered legal wrong'" (quoting *Lujan*, 497 U.S. at 883)). Even if plaintiffs could

demonstrate a sufficient legal injury to establish standing, *but see infra* part II, they

plainly cannot establish that the statements had any legal (as opposed to indirect

practical) effects on them.

## II.    Plaintiffs Lack Article III Standing.

To demonstrate Article III standing, a plaintiff bears the burden of showing "(1) that he or she suffered an injury in fact that is concrete, particularized, and actual or imminent, (2) that the injury was caused by the defendant, and (3) that the injury would likely be redressed by the requested judicial relief." *Daves v. Dallas County*, 22 F.4th 522, 542 (5th Cir. 2022) (en banc) (quoting *Thole v. U.S. Bank N.A.*, 140 S. Ct. 1615, 1618 (2020)).  Plaintiffs allege three main categories of injury: (1) injuries caused by third parties, such as their employers; (2) injuries to their patients; and (3) injuries based on the alleged interference with their ability to practice medicine.  None of these theories demonstrates Article III standing.

A.    First, plaintiffs' allegations of injury caused by independent third parties fail to establish standing.  Plaintiffs allege that as a result of prescribing or promoting ivermectin to treat COVID-19, Dr. Apter was referred to state medical boards for disciplinary proceedings, ROA.932-933, ¶ 18, Dr. Bowden was derided by and forced to resign her privileges at a hospital, ROA.933, ¶ 21, and Dr. Marik was forced to resign from his positions at a medical school and a hospital, ROA.938, ¶ 42.  These alleged harms are predicated on the voluntary and independent decisions of the third parties who took the relevant actions.  As this Court has cautioned, "[s]tanding 'is ordinarily "substantially more difficult" to establish' when 'a causal relation between injury and challenged action depends upon the decision of an independent third party.'"  *Daves*, 22 F.4th 522, 543 (5th Cir. 2022) (quoting *California v. Texas*, 141 S. Ct.

2104, 2117 (2021)). Even assuming the third parties inflicted cognizable injuries, plaintiffs cannot demonstrate that the FDA statements at issue here caused those injuries or that the requested relief would redress them.

For several reasons, plaintiffs have not plausibly alleged that these alleged injuries are fairly traceable to FDA's statements. FDA made statements with no legal effect, directed at consumers. Those statements were not the legal cause of third-party actions toward plaintiffs, even if those third parties might have considered FDA's statements alongside other scientific views on the relevant subject. FDA's statements did not state that doctors may not prescribe ivermectin to prevent or treat COVID-19. Instead, FDA's statements generally recommended that consumers not take ivermectin to prevent or treat COVID-19, noting that FDA had received multiple reports of patients who required medical attention after self-medicating with animal ivermectin, which consumers can purchase without a prescription.

Indeed, the September 2021 article and April 2020 FAQ acknowledge that doctors have discretion to prescribe human ivermectin products. The September 2021 article further states that "[i]f your health care provider writes you an ivermectin prescription, fill it through a legitimate source such as a pharmacy, and take it *exactly* as prescribed." ROA.973. It also recommends that consumers "[t]alk to [their] health care provider[s] about available COVID-19 vaccines and treatment options," explaining that "[y]our provider can help determine the best option for you, based on your health history." ROA.974. The April 2020 FAQ similarly advises consumers

"not [to] take any medicine to treat or prevent COVID-19 unless it has been prescribed to you by your health care provider and acquired from a legitimate source." ROA.976.

Although FDA also sent a letter to the Federation of State Medical Boards and the National Association of Boards of Pharmacy, ROA.1256-1257, it is unclear whether plaintiffs are challenging this letter. ROA.927, ¶ 4 (complaint listing challenged FDA statements and not including this letter). In any event, the letter does not say anything about whether physicians can prescribe ivermectin to prevent or treat COVID-19. Instead, the letter states that "FDA has received complaints about compounding pharmacies selling drug products containing ivermectin, claiming that they can treat or prevent COVID-19." ROA.1256. The letter explains that "the FDA has neither authorized nor approved any ivermectin drug product for use in preventing or treating COVID-19." ROA.1256.

Plaintiffs do not advance their argument by suggesting that FDA intended to "pressure professional and patient judgment about the use of ivermectin." Pls.' Br. 57. As discussed above, the content of the challenged statements demonstrates that FDA's intent was to inform consumers, not to "pressure" third parties to take action against doctors. Nor do the statements take issue with doctors' ability to prescribe human ivermectin to prevent or treat COVID-19. Rather they are directed at consumers, and explicitly recognize the ability of health-care providers to prescribe ivermectin. *See* ROA.973 ("If your health care provider writes you an ivermectin

32

prescription, fill it through a legitimate source such as a pharmacy, and take it *exactly* as prescribed."); ROA.976 (advising consumers "not [to] take any medicine to treat or prevent COVID-19 unless it has been prescribed to you by your health care provider and acquired from a legitimate source").  To the extent that plaintiffs complain that the original version of the article referred to a prescription for "an FDA-approved use," ROA.1239, that passing reference in no respect pressured or directed doctors to alter their prescribing practices and in any event has been replaced by language that makes even more clear that although FDA wanted consumers to be aware of the agency's concerns about using ivermectin to prevent or treat COVID-19, doctors have discretion to prescribe ivermectin for that use.

Relatedly, there is no basis for plaintiffs' apparent view that sophisticated actors in the health-care field premised their employment and licensing decisions on statements by FDA directed to consumers, when other organizations with scientific expertise were delivering the same message.  As noted above, various organizations ranging from the World Health Organization to the sponsor of certain ivermectin products have issued statements recommending against using ivermectin to prevent or treat COVID-19.  ROA.1149, 1263-1264; *WHO Advises that Ivermectin Only Be Used to Treat COVID-19 Within Clinical Trials*, *supra*; *Merck Statement on Ivermectin Use During the COVID-19 Pandemic*, *supra*.

For similar reasons, plaintiffs' alleged injuries are not redressable by the requested relief.  Plaintiffs have not demonstrated that an order declaring the FDA

statements unlawful and setting them aside is likely to change the independent third parties' scientific understanding of the risks and benefits of using ivermectin to prevent or treat COVID-19. Particularly in light of the widespread availability of statements from other organizations with scientific expertise regarding the use of ivermectin to prevent or treat COVID-19, there is little reason to think that the third parties would rescind their actions that allegedly harmed plaintiffs if FDA's statements were declared unlawful.

Plaintiffs argue that if the court declares the FDA statements unlawful, "health professionals, hospitals, and state regulatory boards [that] have supported the off-label prescription of approved drugs"—that is, prescriptions for uses for which the drugs have not been approved—"[f]or decades" "would likely revert to that norm, at least in part." Pls.' Br. 63. But the attitudes of third parties towards off-label prescriptions in general are irrelevant here; what matters is whether it is likely that the third parties who allegedly injured plaintiffs will reverse course on their understanding of the risks and benefits of prescribing ivermectin to prevent or treat COVID-19 and act in a manner that remedies plaintiffs' alleged injuries.

Plaintiffs do not advance their argument by suggesting that they have suffered reputational harm. Pls.' Br. 55. Because plaintiffs do not suggest that FDA made any comments about them specifically, the alleged harm arises from the reaction of third parties to FDA's statements to consumers and thus fails for the reasons stated above. *See* ROA.933, ¶ 21 (alleging that Dr. Bowden "was derided by Houston Methodist

Hospital" and "has been consistently and publicly ridiculed since that time for prescribing ivermectin to treat COVID-19"). Plaintiffs cannot demonstrate that the statements of others are traceable to FDA's statements, as opposed to statements by other organizations in the scientific community, much less that any reputational injury would be redressed if FDA's statements were declared unlawful.

B.     Second, plaintiffs cannot demonstrate standing based on alleged injuries to their patients. Plaintiffs allege that some pharmacists (who are also third parties) have refused to fill ivermectin prescriptions for plaintiffs' patients, that some insurance companies (who are also third parties) are refusing to pay for ivermectin to treat COVID-19, and that some patients have declined or delayed seeking treatment because of FDA's statements. ROA.932, ¶¶ 15, 17; ROA.934, ¶ 27; ROA.935, ¶ 29. These arguments largely fail for the reasons discussed above, as they rely on determinations by sophisticated professionals in the health-care industry who responded to a wide array of scientific information, or to individual past decisions by patients that are highly unlikely to be revisited in response to a judicial decision. But in addition, the arguments fail for a more fundamental reason: these are not plaintiffs' injuries to assert. As the Supreme Court and this Court have explained, "a party generally must assert his own legal rights and interests, and cannot rest his claim to relief on the legal rights or interests of third parties." *Kowalski v. Tesmer*, 543 U.S. 125, 129 (2004) (quotation marks omitted); *see also Vote.Org v. Callanen*, 39 F.4th 297, 303 (5th Cir. 2022).

The Supreme Court has recognized a limited exception to this rule where the plaintiff can demonstrate a "close relationship" to the third party and there is a "hindrance" to the third party's ability to protect his own interests. *Kowalski*, 543 U.S. at 130. Otherwise, the Supreme Court has "not looked favorably upon third-party standing." *Id.* Here, even assuming plaintiffs can demonstrate a "close relationship" to their patients, they have not alleged any "hindrance" to their patients' ability to protect their own interests. Accordingly, plaintiffs do not have third-party standing to assert the rights of their patients. *See Association of Am. Physicians & Surgeons v. FDA*, 13 F.4th 531, 544 (6th Cir. 2021) (plaintiff "has not identified a harm to *physicians* merely because the drug may not be available to *patients*.").

Plaintiffs claim that "[t]he Supreme Court has held that unique considerations inherent in the practice of medicine can allow 'providers to invoke the rights of their actual or potential patients.'" Pls.' Br. 54 (quoting *June Med. Servs. LLC v. Russo*, 140 S. Ct. 2103, 2118 (2020)). What the Supreme Court actually said was that it has "long permitted abortion providers to invoke the rights of their actual or potential patients in challenges to abortion-related regulations." *June Med. Servs.*, 140 S. Ct. at 2118 (finding physicians had Article III standing to challenge regulations of physician conduct and threat of sanctions). The Court's jurisprudence in that area has no apparent relevance here, where, as noted, plaintiffs do not seek to challenge any regulations that affect their ability to treat their patients. Rather, the relevant point is that for plaintiff-physicians to establish third-party standing, they must show that

"enforcement of the challenged restriction *against the litigant* would result indirectly in the violation of third parties' rights." *Kowalski*, 543 U.S. at 130. But here, no FDA "restriction" is being "enforce[d]" against plaintiffs, and there is no violation of any third parties' rights, as the cited FDA statements carry no legal consequence. Plaintiffs cite no case that suggests that even in the absence of any regulation that might be enforced against a health-care provider plaintiff, or any obstacle to litigation by patients, a health-care provider has standing to assert interests of patients.

C.      It is unclear what plaintiffs mean by asserting that FDA's statements have harmed their "ability to practice medicine and treat patients," ROA.934, ¶ 24, and their "ability to exercise professional medical judgment in practicing medicine," ROA.932, ¶ 14. To the extent that these assertions are merely a repackaging of the alleged injuries imposed by third parties, they fail for the reasons discussed above. To the extent that plaintiffs claim that FDA has interfered with their ability to prescribe ivermectin, those claims are contradicted by the allegations in the complaint. In particular, plaintiffs allege that they have continued to prescribe ivermectin to prevent or treat COVID-19, despite the challenged FDA statements. ROA.933-34, ¶¶ 22, 26 (alleging that Dr. Bowden "continues to treat COVID-19 patients" and that "[o]ther doctors have referred patients to Dr. Bowden specifically because she prescribes ivermectin to treat COVID-19"); ROA.931, ¶ 13 (alleging that Dr. Apter "has completed over 6,000 patient consultations for COVID-19" and "has frequently prescribed ivermectin to these patients").

In their brief in this Court, plaintiffs appear to suggest that the government has interfered in some less tangible way with their ability to practice medicine. This vague and unsupported assertion does not provide a basis for standing. Although plaintiffs contend that the government did not dispute in district court that plaintiffs "had stated a plausible claim of interference in the practice of medicine," Pls.' Br. 56, the government did dispute that plaintiffs had any cognizable injury along these lines and nowhere conceded that plaintiffs' theory of liability was viable in any respect. *See, e.g.*, ROA.1460 (arguing that plaintiffs' allegation that FDA "interfere[d] with the practice of medicine" was a "vague and conclusory statement" that "does not adequately allege a concrete injury to Plaintiffs" (alteration in original) (quotation marks omitted)); ROA.1617 (arguing that plaintiffs' alleged injury based on the interference with the practice of medicine does not demonstrate an adequate injury in fact because plaintiffs "have not alleged that they have been unable to prescribe ivermectin to prevent or treat COVID-19"); ROA.1619 (arguing that plaintiffs' allegation that FDA interfered with the practice of medicine does not show a concrete injury because the allegation does not "identify any particular action that Plaintiffs were prevented from taking, but instead alleges interference with an abstract concept"). Plaintiffs now invoke the tort of interference with the physician-patient relationship, which generally involves knowing interference with particular business relationships and has no apparent relevance here. *See, e.g.*, *Regents of the Univ. of Cal. v. Aisen*, No. 15-cv-1766, 2016 WL 1428072, at *3 (S.D. Cal. Apr. 12, 2016) (claim premised on allegations that the

defendant cut off access to electronic systems that were essential to medical practice), *cited in* Pls.' Br. 56.

Plaintiffs do not advance their argument by citing 21 U.S.C. § 396, which states that "[n]othing in [the Act] shall be construed to limit or interfere with the authority of a health care practitioner to prescribe or administer any legally marketed device to a patient for any condition or disease within a legitimate health care practitioner-patient relationship." *Id.* By its terms, this provision makes clear that the Federal Food, Drug, and Cosmetic Act does not limit plaintiffs' authority to prescribe legally marketed devices to their patients. Section 396 does not give plaintiffs a legally cognizable right to prohibit FDA from expressing views on the safety or efficacy of drugs for particular purposes.

## CONCLUSION

For the foregoing reasons, the judgment of the district court should be affirmed.

Respectfully submitted,

*Of Counsel:*

SAMUEL R. BAGENSTOS
*General Counsel*
*U.S. Department of Health and Human*
*Services*

MARK RAZA
*Deputy General Counsel*

BRIAN M. BOYNTON
*Principal Deputy Assistant Attorney*
*General*

ALAMDAR S. HAMDANI
*United States Attorney*

DANIEL TENNY

*U.S. Department of Health and Human*
   *Services*
   *Chief Counsel*
   *Food and Drug Administration*
WENDY S. VICENTE
   *Deputy Chief Counsel, Litigation*
   *Food and Drug Administration*
LEAH A. EDELMAN
   *Associate Chief Counsel*
   *Food and Drug Administration*

   *s/ Ashley C. Honold*
  ASHLEY C. HONOLD
   *Attorneys, Appellate Staff*
   *Civil Division, Room 7261*
   *U.S. Department of Justice*
   *950 Pennsylvania Avenue NW*
   *Washington, DC 20530*
   *(202) 353-9018*
   *ashley.c.honold@usdoj.gov*

March 2023

**CERTIFICATE OF SERVICE**

I hereby certify that on March 9, 2023, I electronically filed the foregoing brief with the Clerk of the Court for the United States Court of Appeals for the Fifth Circuit by using the appellate CM/ECF system. Service will be accomplished by the appellate CM/ECF system.

*s/ Ashley C. Honold*
Ashley C. Honold

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limit of Federal Rule of Appellate Procedure 32(a)(7)(B) because it contains 9,679 words. This brief also complies with the typeface and type-style requirements of Federal Rule of Appellate Procedure 32(a)(5)-(6) because it was prepared using Word for Microsoft 365 in Garamond 14-point font, a proportionally spaced typeface.

*s/ Ashley C. Honold*
Ashley C. Honold

# ADDENDUM

# TABLE OF CONTENTS

21 U.S.C. § 375(b)...............................................................................A1

**21 U.S.C. § 375**

**§ 375. Publicity**

(a) Reports

The Secretary shall cause to be published from time to time reports summarizing all judgments, decrees, and court orders which have been rendered under this chapter, including the nature of the charge and the disposition thereof.

(b) Information regarding certain goods

The Secretary may also cause to be disseminated information regarding food, drugs, devices, tobacco products, or cosmetics in situations involving, in the opinion of the Secretary, imminent danger to health or gross deception of the consumer. Nothing in this section shall be construed to prohibit the Secretary from collecting, reporting, and illustrating the results of the investigations of the Department.